T.C. Memo. 1998-275


UNITED STATES TAX COURT


ALBERT C. JOHNSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22161-96.                    Filed July 29, 1998.


<u>Isham B. Bradley</u>, for petitioner.

<u>Edsel Ford Holman, Jr.</u> and <u>Kirk S. Chaberski</u>, for
respondent.



MEMORANDUM OPINION


JACOBS, <u>Judge</u>: Respondent determined the following
deficiencies and additions with respect to petitioner's Federal
income taxes:

|  |  | Additions to Tax | |
| Year | Deficiency | Sec. 6651(f) | Sec. 6654 |
| 1990 | $14,439 | $10,829 | $949 |
| 1991 | 17,659 | 13,244 | 1,015 |
| 1992 | 3,725 | 2,794 | 161 |
| 1993 | 22,271 | 16,703 | 930 |

In the alternative to the section 6651(f) additions to tax, respondent determined section 6651(a)(1) additions to tax for the years in issue.  In an amended answer, respondent adjusted the amount of the deficiencies made in the notice of deficiency as follows: Respondent increased the 1990 deficiency to $15,179, decreased the 1991 deficiency to $17,511, decreased the 1992 deficiency to $3,348, and decreased the 1993 deficiency to $4,894. For all of these years, respondent made corresponding adjustments to the additions to tax.

Respondent determined that petitioner must include in income unreported gross receipts from the operation of a cattle-breeding business.  Petitioner agrees that there were unreported gross receipts from his cattle-breeding operation, but claims that a portion of these receipts is amounts from sales of cattle belonging to others.

Following concessions by the parties, the issues remaining to be decided are: (1) Whether petitioner must include in income unreported gross receipts from his cattle-breeding operation in 1990-93 in amounts determined by respondent; (2) whether petitioner is entitled to deductions for: (a)  Cash expenditures for cattle

feed for each of the years in issue; (b) a 1990 trip to Belgium; and (c) depreciation for a barn for each of the years in issue; and (3) whether petitioner is liable for the section 6651(f) fraudulent failure to file addition to tax, or in the alternative the section 6651(a)(1) failure to file addition to tax, for each of the years in issue.[1]

All section references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedures.  Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

### General Findings

At the time the petition was filed, petitioner resided in Tennessee.  During the years in issue, petitioner was married to Juanita Johnson; she resided much of the time in Panama City, Florida.  Petitioner did not file Federal income tax returns for any of the years in issue.

For convenience and clarity, we have combined our remaining findings of fact and opinion with respect to each issue.

---

[1] Petitioner concedes that should we conclude that the sec. 6651(f) addition to tax is not applicable, then the sec. 6651(a)(1) addition to tax would be applicable to any finally determined deficiency.

Issue 1.   Amount of Unreported Receipts From Cattle-Breeding Operation

We first address the amount of petitioner's unreported gross receipts during the years 1990-93 from his cattle-breeding operation.

Petitioner was employed by Stouffer Chemical until 1986 when he became disabled and began receiving disability and Social Security benefits.  In 1989, he began to supplement his disability benefits by breeding and raising Belgian blue cattle.  Belgian blue cattle are a unique breed:  originally imported from Belgium, they have a high meat to bone ratio and are low in fat and cholesterol.[2] (Belgian blue cattle are even lower in fat and cholesterol than skinless chicken breast.)

Petitioner first became interested in Belgian blue cattle as a consequence of his being (in his words) "overweight" (360 pounds) and having suffered several heart attacks.  He wished to raise healthy meat for his own personal consumption, as well as to promote the breed so that others similarly situated could enjoy low-fat beef.

Petitioner purchased his first heifer from agents of Philip Stennett in 1989, and since that time petitioner has maintained about 10 cows on his 24-acre farm in Fairview, Tennessee.  Mr.

_____

[2]   Following World War II, the Belgian Government sought to produce cattle with a high ratio of meat to feed its people following their freedom from occupation.

Stennett is a British cattle breeder, doing business as The Cattle Company. He was one of the original importers of Belgian blue cattle from Belgium to Britain. Mr. Stennett is the past president of the Belgian Blue Association.

Petitioner advertised his breeding operation (known as Johnson's Belgian Blue Cattle) in farmers' and/or cattlemen's trade magazines.

The offspring from petitioner's first heifer were outstanding; petitioner won several awards in the United States. Others approached him with regard to finding Belgian blue cattle. Petitioner was unable to meet the demand for Belgian blue cattle through his own operations. Consequently, petitioner agreed to broker the purchase and sale of Belgian blue cattle in the United States for Mr. Stennett and others, notably a partnership consisting of the Vanderhayden family of Ontario, Canada, and Orliin Pelton.[3] In this regard, Mr. Stennett would send Belgian blue cattle embryos--which had been "flushed" from Belgian blue cattle in Britain, frozen, and then transferred--to Canadians[4] such as the Vanderhayden family, who would then implant the Belgian blue embryos into non-Belgian blue heifers at the Vanderhayden farm.

---

[3] The record does not contain any specific information regarding Mr. Pelton.

[4] During the years in issue, U.S. law prohibited the direct importation of Belgian blue cattle embryos from Britain to the United States.

Following a quarantine period required under U.S. law, petitioner would drive a truck with a trailer from Tennessee to the Canadian border where he would pick up the impregnated heifers. Petitioner would then return to Tennessee and deliver the heifers to the ultimate buyers. Occasionally, the Vanderhaydens would travel to Tennessee to pick up the proceeds from the sales of the heifers.

Petitioner did not specifically travel to Canada in order to broker the deals on behalf of Mr. Stennett or the Vanderhaydens. Rather, he would travel to Canada to purchase cattle for himself and concurrently pick up heifers implanted with Belgian blue embryos (in his broker capacity) and deliver them to the ultimate buyer.

A majority of the transactions engaged in by petitioner were completed informally, often on a handshake. Contracts or other documentation of transactions was rare, although registration of Belgian blue cattle did occur.

Petitioner did not maintain any books or records that accurately reflected his cattle operations or sales he made on behalf of others. During the years in issue, petitioner utilized a bank account at Third National Bank, account number 8651884, for his business operations. That account was in the names of petitioner and his wife.

Because of petitioner's failure to file Federal income tax returns for the years in issue, an agent of the Internal Revenue

Service began an examination of petitioner's 1990-93 tax years. On the basis of this examination, the agent reconstructed petitioner's income from his cattle-breeding operations for years 1990-93 by combining a bank deposit analysis of the Third National Bank account held by petitioner and his wife with an analysis of nondeposited cash sales of cattle. The parties stipulated that the following represents a proper calculation of the unreported gross receipts received by petitioner from his cattle-breeding operation during the years in issue:

|  | 1990 | 1991 | 1992 | 1993 |
|---|---|---|---|---|
| Total deposits to bank account | $55,370.14 | $151,571.06 | $80,084.43 | $110,639.83 |
| Less: nonincome deposits | 30,527.77 | 56,150.95 | 37,417.52 | 71,427.61 |
| Net income deposits | 24,842.37 | 95,420.11 | 42,666.91 | 39,212.22 |
| Add: receipts from cattle sales not deposited | 39,810.90 | 33,850.00 | 1,000.00 | 13,500.00 |
| Unreported gross receipts | 64,653.27 | 129,270.11 | 43,666.91 | 52,712.22 |

Petitioner, however, maintains that a portion of each year's "unreported gross receipts" produced from his cattle-breeding operation represents amounts he received on behalf of others with respect to their interests in the cattle sold. In this regard, petitioner claims that he received the following amounts on behalf of the Vanderhaydens and Mr. Stennett (as well as others), which

respondent erroneously included in the calculation of petitioner's unreported gross receipts:

|  | 1990 | 1991 | 1992 | 1993 |
|---|---|---|---|---|
| Vanderhaydens | $11,814.70 | $21,181 | $15,096 | $15,896 |
| Stennett/others | --- | 37,000 | --- | --- |

Respondent maintains that to the extent petitioner made cash payments to the Vanderhaydens and/or Mr. Stennett (and others), such payments were made with funds not considered by respondent in the determination of petitioner's unreported gross receipts.

## Discussion

Section 6001 requires all taxpayers to maintain adequate books and records of taxable income. In the absence of adequate books and records, the Commissioner may recompute the taxpayer's income by any reasonable method that clearly reflects the taxpayer's income. Sec. 446(b); Holland v. United States, 348 U.S. 121, 130-132 (1954); Parks v. Commissioner, 94 T.C. 654, 658 (1990). One of these methods is the bank deposits method. DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Although not conclusive, the bank deposits calculation is considered to be prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Here, because petitioner did not file income tax returns for the years in issue, the Commissioner reconstructed petitioner's income for each of these years through the use of the bank deposits method combined with specific nondeposited cash sales of cattle.

Generally, respondent's determination in a statutory notice of deficiency is entitled to a presumption of correctness. <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).[5] The fact that in the instant case respondent's revised computation of income reduced the amount of petitioner's unreported income for 3 of the 4 years in issue does not affect the presumption of correctness attached to respondent's original determination of petitioner's tax deficiency, to the extent not reduced by respondent's revision. See <u>Gobins v. Commissioner</u>, 18 T.C. 1159, 1168-1169 (1952), affd. per curiam 217 F.2d 952 (9th Cir. 1954).

Amounts received by a taxpayer while acting as an agent or conduit are not required to be reported as income. <u>Goodwin v. Commissioner</u>, 73 T.C. 215, 230 (1979); see also <u>Liddy v. Commissioner</u>, T.C. Memo. 1985-107, affd. 808 F.2d 312 (4th Cir. 1986). As we stated in <u>Diamond v. Commissioner</u>, 56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974): "We accept as sound law the rule that a taxpayer need not treat as income moneys which he did not receive under a claim of right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit."

We accept petitioner's assertion that he received moneys while acting as an agent for Mr. Stennett and the Vanderhaydens. In this

---

[5] Respondent has the burden of proof with regard to the 1990 increased deficiency asserted in the amended answer. Rule 142(a).

vein, petitioner credibly testified that he acted as an agent for Mr. Stennett and the Vanderhaydens because he was "trying to help a fellow breeder * * * and trying to promote a breed of cattle that [he] thoroughly believed in".  Nonetheless, petitioner failed to convince us that the amount of unreported gross receipts for the years in issue, as stipulated,[6] included cash payments he made to the Vanderhaydens and/or Mr. Stennett (and others) as agent for others.  Further, petitioner failed to show that other than the amount by which petitioner's cattle-breeding receipts were reduced to reflect amounts petitioner paid to the Vanderhaydens and Mr. Stennett (the Cattle Company) by check, respondent was aware of cash payments to them in reconstructing petitioner's income.  Mr. Stennett as well as Marion Vanderhayden testified that in examining their books and records, they could not differentiate which of the payments they received from petitioner represented payments for cattle petitioner purchased from them for his own operation, and which represented proceeds from sales to others in which petitioner acted as their (the Vanderhaydens' or Mr. Stennett's) broker. Petitioner's lack of records, as well as the skimpy record before us, inhibit us from further reducing the stipulated unreported

---

[6]    The stipulated amount of petitioner's cattle-breeding gross receipts was reduced to reflect:  (1) Amounts petitioner paid the Vanderhaydens by check as follows: 1991--$14,241, 1992--$1,500, and 1993--$700; and (2) amounts petitioner paid Mr. Stennett (The Cattle Company) by check as follows: 1992--$1,450.23, and 1993--$12,500.

gross receipts for purported cash amounts petitioner received from others on behalf of Mr. Stennett and the Vanderhaydens.

To summarize, because petitioner failed to keep adequate books and records and did not file Federal income tax returns for the years in issue, we conclude that respondent properly reconstructed petitioner's income for the years in issue with one exception relating to tax year 1990. That exception relates to $9,500 which petitioner claims, and we accept as true, belonged to his father, and resulted from the sale of a bull purchased and resold by petitioner's father. Thus, petitioner's gross receipts as determined by respondent for 1990 should be reduced by $9,500.

Issue 2. Expenses

We next address whether petitioner is entitled to deductions for expenses in excess of those agreed upon through an analysis of petitioner's checks. Specifically, petitioner claims entitlement to deductions for (a) cash expenditures for cattle feed, (b) a portion of the expenses for a trip to Belgium in 1990, and (c) depreciation for a barn.

Discussion

As often stated, deductions are a matter of legislative grace. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers bear the burden of establishing that they are entitled to the claimed deductions. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 114 (1933). This includes the burden of substantiating the

amount and purpose of the item claimed.  Sec. 6001; <u>Hradesky v. Commissioner</u>, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976); sec. 1.6001-1(a), Income Tax Regs.  If claimed deductions are not adequately substantiated, we are permitted to estimate them, provided we are convinced from the record that the taxpayer has incurred such expenses and we have a basis upon which to make an estimate.  <u>Cohan v. Commissioner</u>, 39 F.2d 540 (2d Cir. 1930); <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 743 (1985).

Pursuant to section 162(a), a taxpayer may deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.  In general, an expense is ordinary if it is considered "normal, usual, or customary" in the context of the particular business out of which it arose.  <u>Deputy v. duPont</u>, 308 U.S. 488, 495-496 (1940).  An expense is necessary if it is appropriate and helpful to the operation of the taxpayer's trade or business.  <u>Carbine v. Commissioner</u>, 83 T.C. 356, 363 (1984), affd. 777 F.2d 662 (11th Cir. 1985); <u>Heineman v. Commissioner</u>, 82 T.C. 538, 543 (1984).  Only the portion of an expense that is reasonable in amount is deductible under section 162.  <u>United States v. Haskel Engg. & Supply Co.</u>, 380 F.2d 786, 788-789 (9th Cir. 1967). Pursuant to section 262(a), no portion of any expenditure attributable to personal, living, or family expenses may be deducted, except as otherwise expressly provided in the Code.

(a) Cattle Feed

Petitioner agrees with respondent's analysis of petitioner's deductible business-related expenses as evidenced by checks.

Petitioner purchased cattle feed during the years in issue. He contends that he is entitled to a $6,000 deduction for cash purchases of feed during each of the years in issue.

Petitioner presented two witnesses with regard to the amount of the cattle feed expenses. One, Hubert Wiles, owner of the R.L. Wiles Feed Mills Store in Tennessee, testified that during the years in issue petitioner paid him a total of at least $1,560 a year for cattle feed (in both cash and check). The other, Warren Edward Paul Gagner, Jr., owner of G&G Feed and Seed in Dickson, Tennessee, also testified that he sold feed to petitioner during the years in issue. Mr. Gagner testified that he was unsure as to the specific amount of feed petitioner purchased during the years in issue.

The deductions agreed to by the parties included amounts petitioner paid to Mr. Wiles by check for the years in issue (1990--$217, 1991--$529.90, 1992--$399.75, and 1993--$204.50), as well as amounts petitioner paid to Mr. Gagner by check (1992--$530.18, and 1993--$670.60), but did not include any cash amounts expended for cattle feed.

We found the testimony of both Messrs. Wiles and Gagner to be credible. Based on the record before us, and using our best

estimate, we find that petitioner paid an aggregate of $10,000 (by cash and check) for the 4 years in issue for the cattle feed, or an average of $2,500 per year.  See Cohan v. Commissioner, supra; Vanicek v. Commissioner, supra.  The following summarizes the cash payments we believe petitioner made to Messrs. Wiles and Gagner:

| Year | Cash Payments Made to Mr. Wiles | Cash Payments Made to Mr. Gagner | Total Cash Expenses Allowed |
|------|------|------|------|
| 1990 | $1,343.00 (1,560-217) | $940.00 (2,500-1,560) | $2,283.00 |
| 1991 | 1,030.10 (1,560-529.90) | 940.00 (2,500-1,560) | 1,970.10 |
| 1992 | 1,160.25 (1,560-399.75) | 409.82 (2,500-1,560-530.18) | 1,570.07 |
| 1993 | 1,355.50 (1,560-204.50) | 269.40 (2,500-1,560-670.60) | 1,624.90 |

### (b)  Trip to Belgium

Petitioner traveled to Belgium in 1990.  Initially, petitioner claimed entitlement to a $2,800 deduction with regard to the trip (consisting of $1,800 in airfare and $1,000 for expenses), which he asserted was business related.  At trial, petitioner admitted that he spent only $800 for the trip.

Petitioner has failed to produce any evidence to prove that he expended $800 for a 1990 trip to Belgium.  Thus, we hold that he is not entitled to a deduction for a 1990 trip to Belgium.

### (c) Barn Depreciation

In approximately 1986, petitioner built a 60- by 100-square foot barn to house horses for his 5 children.  Petitioner testified that the barn cost approximately $30,000, and that it was appraised for $69,000.  The barn contained 14 stalls, an office, wash rack, and feed room.  In 1989, when petitioner became interested in the Belgian blue cattle, he converted the barn to house cattle.

Petitioner claims entitlement to a $3,000 depreciation deduction per year related to the barn, based on straight-line depreciation.

Section 167 generally allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business, or property held for the production of income. Under section 168, depreciation for an agricultural or horticultural structure is calculated using a 10-year recovery period. Sec. 168(e)(3)(D)(i). Under the straight-line method, the cost or other basis of the property less its estimated salvage value is deductible in equal annual amounts over the period of the estimated useful life of the property. Sec. 1.167(b)-1(a), Income Tax Regs.

We accept petitioner's testimony that the barn was placed into service in 1989 as part of his cattle-ranching operation and that it had a 10-year life with a depreciable basis of $30,000. Accordingly, we hold that petitioner is entitled to a $3,000 depreciation deduction for each year in issue.

To conclude, the following summarizes our determination of petitioner's net income from his cattle-breeding operations for the years in issue:

|              | 1990         | 1991          | 1992         | 1993         |
|--------------|--------------|---------------|--------------|--------------|
| Gross receipts | $64,653.27 | $129,270.11 | $43,666.91 | $52,712.22 |
| Father's bull | (9,500.00) | --- | --- | --- |
| Adjusted gross income | 55,153.27 | 129,270.11 | 43,666.91 | 52,712.22 |
| Stipulated deductions | (28,723.00) | (81,888.00) | (31,304.00) | (40,819.00) |
| Cash cattle feed expenses | (2,283.00) | (1,970.10) | (1,570.07) | (1,624.90) |
| Barn depreciation | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) |
| Net income | 21,147.27 | 42,412.01 | 7,792.84 | 7,268.32 |

## Issue 3.  Section 6651(f) Addition to Tax

The final issue is whether petitioner is liable for the fraudulent failure to file addition to tax pursuant to section 6651(f) for each of the years in issue.  Respondent contends that petitioner is liable for the addition to tax.  Petitioner disagrees.

Section 6651(f) imposes an addition to tax for failure to file a tax return.  Where the failure to file is fraudulent, the addition to tax is 15 percent of the amount required to be shown on the return for each month beyond the return's due date, up to a maximum of 75 percent.  (If the failure to file is not fraudulent and is not due to reasonable cause, the addition to tax is 5 percent of the amount required to be shown on the return for each month that the return is not filed, up to a maximum of 25 percent.)  Respondent bears the burden of proving by clear and convincing

evidence that the failure to file was fraudulent.  Sec. 7454(a); Rule 142(b); Clayton v. Commissioner, 102 T.C. 632, 652-653 (1994). Respondent's burden is met if it is shown that petitioner intended to evade taxes known to be due and owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes, and that there is an underpayment of tax.  Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Acker v. Commissioner, 26 T.C. 107, 112 (1956). Respondent cannot satisfy the burden of proving fraud simply by piling inference upon inference.

The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  DiLeo v. Commissioner, 96 T.C. at 874. Fraud is never presumed but, rather, must be established by affirmative evidence.  Edelson v. Commissioner, 829 F.2d 828, 832-833 (9th Cir. 1987), affg. T.C. Memo. 1986-223. Direct evidence of the requisite fraudulent intent is seldom available, but fraud may be proved by circumstantial evidence. Spies v. United States, 317 U.S. 492, 499 (1943).  The taxpayer's entire course of conduct may establish the requisite intent.  Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969).

Over the years, courts have identified various factors from which fraudulent intent can be inferred.  These include: (1) Maintaining inadequate records; (2) failing to file tax returns;

(3) giving implausible or inconsistent explanations of behavior; (4) concealing assets; (5) failing to cooperate with tax authorities; (6) engaging in illegal activities; (7) attempting to conceal illegal activities; (8) dealing in cash; and (9) failing to make estimated tax payments. Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). These "badges of fraud" are nonexclusive, and none of them is dispositive in and of itself. Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992). A taxpayer's sophistication, education, and intelligence may be considered in determining whether or not he had fraudulent intent. See Halle v. Commissioner, 175 F.2d 500, 502 (2d Cir. 1949), affg. 7 T.C. 245 (1946); Niedringhaus v. Commissioner, supra; see also Wheadon v. Commissioner, T.C. Memo. 1992-633.

Although there are several factors or "badges" existing in this case which might indicate fraud, on balance, we believe that respondent has not proven fraud by clear and convincing evidence. We observed petitioner at trial. His testimony reflected that he lacked financial sophistication and that he strongly believed that his cattle-breeding operation did not generate sufficient net income to require the filing of a tax return.

We do not sustain respondent's finding of fraud when we are only left with a suspicion of fraud. Green v. Commissioner, 66 T.C. 538, 550 (1976); see Comparato v. Commissioner, T.C. Memo. 1993-52. In the instant case, we cannot conclude that petitioner

committed fraud, inasmuch as respondent has failed to adduce evidence showing petitioner's intentional wrongdoing. Accordingly, we do not sustain respondent's determination with regard to the section 6651(f) additions to tax for fraud. Because petitioner concedes that the section 6651(a)(1) additions would be applicable in this instance, we direct the parties to determine the amount of those additions in the Rule 155 computations.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered under Rule 155</u>.